US DISTRICT COURT
WESTERN DIST ARKANSAS
FILED

**NOV 0 4 2016**

DOUGLAS F. YOUNG, Clerk
By
Deputy Clerk

## IN THE UNITED STATES DISTRICT COURT
### WESTERN DISTRICT OF ARKANSAS
### FAYETTEVILLE DIVISION

CHRISTOPHER A. ARNOLD, M.D., P.A.                              PLAINTIFF

    vs.


D1 SPORTS MEDICINE, LLC                                    DEFENDANT
                                                  COUNTER-PLAINTIFF

    vs.                    Case No.: 5:16-cv-05178-PKH


CHRISTOPHER A. ARNOLD, M.D., P.A.            COUNTER-DEFENDANT
                                            THIRD PARTY PLAINTIFF

    vs.


GREG PERRY, an Individual Tennessee Resident,
DAVID MCINTOSH, an Individual Tennessee Resident,
MEDICAL BILLING SERVICES, LLC,
TERRI CONNELL, an Individual Alabama Resident,
MEDICAL BILLING SOLUTIONS, LLC,
D1 SPORTS PARENT, LLC,
MILLENNIUM RISK MANAGERS, LLC,
JOHN DOES 1-5                                            DEFENDANTS


## FIRST AMENDED AND THIRD PARTY COMPLAINT AT LAW, AND PETITION FOR DECLATORY JUDGMENT

    Comes now the plaintiff, Christopher A. Arnold, M.D., P.A, and for its first

amended and third-party complaint and petition for declaratory judgment against D1

Sports Medicine, LLC, Greg Perry, Medical Billing Services, LLC, Terri Connell, Medical

Billing Solutions, LLC, D1 Sports Parent, LLC, D1 Sports Holdings, LLC, and Millennium

Risk Managers, LLC, and John Doe Nos. 1-5, and amended petition for declaratory judgment, states and alleges as follows:

## Jurisdiction and Venue

1.      Christopher A. Arnold, M.D., P.A. (hereinafter "Arnold"), is registered to do, and is, in fact, doing business in the State of Arkansas.

2.      Arnold functions as a medical clinic that offers numerous health care services in orthopedics and sports medicine, including surgical, non-surgical, therapy, rehabilitation, and training services (hereinafter generally referred to as "Arnold's services").

3.      Arnold's therapy, rehabilitation, and training services specifically include physical therapy, occupational therapy, sports rehabilitation, industrial rehabilitation, and athletic training services (hereinafter collectively referred to as Arnold's "therapy services").

4.      D1 Sports Medicine, LLC (hereinafter "D1 Sports Medicine"), is a Tennessee limited liability company that maintains a principal place of business in Franklin, Tennessee.

5.      D1 Sports Medicine is registered to do, and is in fact doing, business in Fayetteville, Washington County, Arkansas. But none of the other businesses that are named herein have ever been registered to do business in the State of Arkansas.

6.      D1 Sports Medicine's registered agent is Corporation Company, 124 W. Capitol Ave., Suite 1900, Little Rock, AR 72201.

7.      On or about August 18 and August 27, 2015, Arnold and D1 Sports Medicine,

respectively, executed what is attached and incorporated herein is **Exhibit A** hereto.

8.      Upon current information or belief, Greg Perry is an individual resident of Olive Branch, Mississippi; he is President and an owner of D1 Sports Medicine, as well as the Chief Operating Officer and owner of MedXsys, which purports to offer "physicians with profitable turn-key operations. By eliminating administrative distractions, physicians are able to focus on providing the highest clinical outcome for their patients. The combined network of Medxsys resources operate in synergy to produce a coordinated team of specialists dedicated to providing ancillary service options to physician practices: from billing and collections, to physical therapy, to cash flow management, the physician is able to integrate the services most beneficial to their practice."

9.      Upon current information or belief, David McIntosh is an individual resident of Tulsa, Oklahoma; he is the Regional Director of Operations for D1 Sports Medicine.

10.      The true and full corporate name, and place of registration, of "MedXsys" is currently unknown, despite Arnold's investigation. For that reason, MedXsys is referred to as "John Doe No. 1" in the style of this pleading, but it shall be referred to as "MedXsys" herein-below.

11.      Upon current information or belief, the ownership, management, or other business interests of MedXsys were at all relevant times shared, whether in whole or part, and whether directly or indirectly, with D1 Sports Medicine, Medical Billing Services, LLC, Medical Billing Solutions, LLC, D1 Sports Parent, LLC, and Millennium Risk Management, LLC.

12.      Upon current information or belief, D1 Sports Medicine is part of the "D1"

business (company) brand whose ownership, management, or other business interests of numerous D1 companies, only two of which are named herein, are shared.

13.     Upon current information or belief, D1 Sports Parent, LLC (hereinafter "D1 Sports Parent"), is, in addition to Greg Perry and his partner Charles Hall, an owner of D1 Sports Medicine.   D1 Sports Parent is a limited liability company that is likewise registered in Tennessee and principally offices in Franklin, Tennessee.

14.     Upon current information or belief, no company named "Medical Billing Services, LLC" (hereinafter "Medical Billing Services"), has ever existed vis-à-vis these parties or subject matters; no such company has ever been registered in Arkansas, Tennessee, Alabama, or any other State.

15.     Upon current information or belief, individual defendant Terri Connell is a resident of the State of Alabama. Ms. Connell held herself out to Arnold as, and was held out by agents of D1 Sports Medicine, including David McIntosh and Greg Perry, to be, "President" of "Medical Billing Services, LLC".

16.     In fact, however, neither as of the times at which the herein-below described representations and inducements were made, nor the dates on which Arnold and Ms. Connell (purportedly on behalf of Medical Billing Services, LLC) executed the *Billing and Collection Agreement* dated October 29, 2015 (**Exhibit B** hereto), was Ms. Connell actually the president of a company named "Medical Billing Services, LLC," as no such company in that name existed.

17.     Rather, Ms. Connell was *actually* the credentialing and marketing manager for D1 Sports Training, LLC (Alabama company), which is part of the same "D1" brand

-4-

of companies as D1 Sports Medicine. And she was also the Vice-President of MedXsys *and* marketing director for Millennium Risk Managers, LLC (hereinafter "MRM").

18.     Upon current information or belief, Medical Billing Solutions, LLC (hereinafter "Medical Billing Solutions"), is an Alabama limited liability company that has its principal place of business in Montgomery, Alabama.  It is neither currently nor at any relevant time formerly registered to do business in Arkansas, though it has been engaged in business in Arkansas for at least the past year, approximately.

19.     Upon current information or belief, MRM is an Alabama limited liability company that has its principal place of business in Birmingham, Alabama.  It is neither currently nor previously registered to do business in Arkansas, though it has been engaged in business in Arkansas for approximately the past year.

20.     MRM, of which Defendant Terri Connell was, at all times relevant, the marketing director, is an *owner* of Medical Billing Solutions.

21.     Medical Billing Solutions purports to have purchased all of the assets of Medical Billing Services, LLC, including all contract rights vis-à-vis the *Billing and Collection Agreement* between Arnold and Medical Billing Services, LLC, of which Terri Connell was held out as the "President."

22.     Upon current information or belief, Amy Mizell was, at all relevant times, an owner and manager of Medical Billing *Solutions*, as well as the medical billing manager of MedXsys sometime prior to October of 2015 through January of 2016. Additionally, she is currently or formerly employed by or associated with D1 Sports Medicine and/or one or more of the other "D1" branded companies with which D1 Sports Medicine is affiliated.

23.     Upon current information or belief, MRM provided bookkeeping services to Medical Billing Solutions, at all relevant times herein.

24.     Hence, Medical Billing Solutions, which is owned by Ms. Mizell and a company for which Ms. Connell served as marketing director (MRM), purportedly purchased the assets and liabilities of a fictitious company for which Ms. Connell purportedly served as president (Medical Billing Services, LLC), including the rights and obligations under Arnold's *Billing and Collection Agreement* with Medical Billing Services, LLC.

25.     John Doe Nos. 1-5 are additional defendants whose true identities are currently unknown to Arnold, despite inquiry and investigation in the matter, and who participated in one or more of the torts that are alleged herein. An affidavit is attached and incorporated herein, as **Exhibit C** hereto, pursuant to Arkansas law.

26.     "D1" is a brand of business, and a number of different companies, only some of which are named herein as defendants, share ownership, management, and/or business interests.

27.     Upon current information or belief, all of the hereinabove-described relationships and business interests were, at all relevant times, known to Defendants Greg Perry, David McIntosh, Terri Connell, Amy Mizell, and the other owners and managers of the entities named herein.

28.     The contracts that are attached and incorporated herein as Exhibits A and B hereto were executed in the State of Arkansas, and they concern business services rendered within the State of Arkansas.

29.     The statements about which Arnold complains herein were statements that were made in or delivered into in the State of Arkansas.

30.      All of the acts and omissions about which Arnold complains herein took place in Fayetteville, Washington County, Arkansas.

31.     This action concerns the written *Therapy Management Agreement* (hereinafter the "TMA") between Arnold and D1 Sports Medicine, which was executed and otherwise delivered into the State of Arkansas in August, 2015; see **Exhibit A** hereto.

32.     The health care (therapy management) services about which the TMA is concerned were, until the time they were rendered, performed in Fayetteville, Washington County, Arkansas.

33.     Per its terms, the TMA is to be construed and interpreted in accordance with the laws of the State of Arkansas.

34.     The aforementioned *Billing and Collection Agreement* (hereinafter "BCA") between Arnold and "Medical Billing Services, LLC," was, ostensibly, entered into in Fayetteville, Arkansas, and the separate services that were rendered pursuant thereto were services rendered in Arkansas.

35.     This is a declaratory judgment action, brought pursuant to Ark. Code. Ann. § 16-11-101 et seq., and, in addition thereto or as an alternative thereof, a fraud, civil conspiracy, breach of contract, and promissory estoppel action brought against the defendants, pursuant to Arkansas law.

36.     Arnold seeks to have both the TSA and BCA declared void or voidable by Arnold; the TSA should be declared void or unenforceable against Arnold because it

violates the public policies of the State of Arkansas, and the BCA should be declared void

because it was executed by someone who purported to act on behalf of a party (company)

that did not have the legal capacity to enter into contracts or engage in other business in or

outside the State of Arkansas.

37.     This Court has jurisdiction over both the subject matter and parties named

herein, and venue properly lies in this Court.

**Facts Relative to D1 Sports Medicine**

38.     The TSA provides that, D1 Sports Medicine is to be Arnold's "exclusive

provider of therapy services," and to, among other things: develop, organize, and operate a

program for the provision of all rehabilitation services, including but not limited to,

physical therapy, occupational therapy, sports rehabilitation, and industrial rehabilitation,

needed by Arnold's patients (i.e., all of Arnold's therapy services); hire, review, assess,

supervise, train, and replace all clinical and non-clinical personnel that are "leased

employees" of D1 Sports Medicine, as necessary for the provision of the therapy services

offered to Arnold's patients; prepare, provide, revise, as necessary, personnel policies and

procedures for the leased employees; meet with Arnold and therapy personnel on a regular

basis to assess the therapy services and the provision of such services, including any

improvement in practices and performance thereof; prepare, provide, revise, as necessary,

policies and procedures for provisions of therapy services; and implement and maintain

necessary billing procedures for the billing and collection of all therapy services.

39.     Further, and as referenced above, the TSA prescribes the leasing, by D1

Sports Medicine to Arnold, of all non-clerical, licensed, and certified personnel, including

all physical therapists, certified athletic trainers, and occupational therapists, in Arnold's medical practice.

40.     As part of the TSA, D1 Sports Medicine and its representatives, namely Greg Perry and David McIntosh, represented and warranted that D1 Sports Medicine's leased employees had all necessary education and training needed to perform their services.

41.     Implicit in the TSA was the promise by D1 Sports Medicine to provide Arnold with leased employees who would provide high quality patient care to Arnold's patients that was at least as good as the quality of care that had been provided by Arnold's previous therapy service providers.

42.     Additionally, the TSA provides that Arnold can accept or reject the leased employees, based on Arnold's standards and requirements, and it purports to give Arnold control and supervision authority over D1 Sports Medicine's leased employees, to the full extent to which Arnold may do so over its own employees.

43.     Further, Arnold has the purported right under the TSA to request that a leased employee's employment with D1 Sports Medicine be terminated.

44.     However, the TSA further reads that, D1 Sports Medicine has the "sole authority and responsibility for hiring, evaluating, replacing, disciplining, and terminating the Leased Employee."

45.     What is more, it confers sole responsibility and complete management control over all billing services in connection with all of D1 Sports Medicine's leased employees' therapy services in Arnold's medical clinic, from which Arnold was assured he would

profit, to D1 Sports Medicine.

46.     Simply put, the TSA requires Arnold to use D1 Sports Medicine, and no one else, as Arnold's "exclusive provider" of all therapy services in Arnold medical clinic, as well as Arnold's exclusive therapy-management and therapy-billing service provider.

47.     The TSA has an initial term of five (5) years.

48.     Pursuant to Section 8.2 of the TSA, and upon 90 days' notice, Arnold may terminate the TSA for specific (limited) "economic reasons," but it may do so only after the expiration of 12 months from the "effective date" of the agreement.

49.     The "effective date" of the TSA was on or about October 1, 2015, which means the TSA prohibits Arnold's termination of the agreement, for economic reasons, any sooner than on or about September 30, 2016.

50.     Accordingly, even if it were to prove a basis for termination, for "economic reasons," as that term has been narrowly defined in the agreement, Arnold would not be able to do so any sooner than on or about September 30, 2016.

51.     Further, pursuant to Section 8.3 of the TSA, Arnold may terminate the agreement if D1 Sports Medicine "fails to keep, observe, or perform any material term, agreement, or provision of this Agreement."

52.     However, nowhere in the TSA is the quality or issue of patient-care, or the quality of D1 Sports Medicine's therapy services, therapy-management services, or billing management services, even addressed.

53.     It is critical that Arnold and other healthcare providers in Arkansas maintain good relationships with their patients, as it benefits both the providers and, most

-10-

importantly, the providers' patients from a healthcare perspective.

54.     The higher the level and quality of the healthcare services that are provided by Arnold's medical practice, the higher the level and quality of patient-care and satisfaction and, more specifically, the higher and more successful level of medical treatment, rehabilitation, recovery, and, ultimately, results.

55.     The quality of healthcare services that are provided by Arnold also affects the relationships that Arnold has with other physicians, namely physicians who refer their patients to Arnold for orthopedic and therapy services.

56.     Furthermore, the quality of Arnold's services affects the reputation of Arnold's principal physician, Christopher A. Arnold, M.D., and the reputation of his medical practice in the community, which, in turn, has an effect on the reputation of the medical community in Fayetteville and northwest Arkansas.

57.     What is more, Arnold's inability to make a profit from the therapy services that are provided by D1 Sports Medicine affects Arnold's financial condition, which in turn affects his medical practice, the cost to operate the same, and healthcare costs.

58.     As an inducement to enter into the TSA, D1 Sports Medicine's agents, namely Defendants Greg Perry and David McIntosh, represented and promised that its services would improve both patient-care and satisfaction at Arnold, improve the work environment in the therapy service department at Arnold, and improve Arnold's financial structure and increase its financial stability and profitability.

59.     At no time subsequent to the parties' execution of the TSA were *any* of D1 Sports Medicine's representations or promises proven true, or fulfilled, though Arnold

gave D1 Sports Medicine reasonable opportunity to do so.

60.     In fact, the quality of Arnold's patient-care, as it specifically relates to D1 Sports Medicine's therapy and therapy management services, had dramatically decreased prior to Arnold's termination of the TSA; the number and frequency of patient-complaints substantially increased; the department experienced a high level of employment (lease employee) turnover and discord in a relatively short amount of time, which affected continuity, efficiency, and the work environment; Arnold's medical clinic had become far less conducive to a high level of overall patient treatment and care than it was prior to the parties' agreement (TSA); and Arnold was, prior to contract termination, was suffering substantial lost business profits in connection with the therapy services that were provided and managed by D1 Sports Medicine.

61.     The disruptive problems with which Arnold had to deal prior its termination of the TSA, in connection with D1 Sports Medicine's therapy and therapy management and billing services included, among others, the following:

*       The lack of any smooth transition from Arnold's previous therapy service provider to D1 Sports Medicine.

*       D1 Sports Medicine's hiring and placement of Amy Jackson as the therapy department's new director.

*       Not long after the Agreement was signed, D1 Sports Medicine demanded that Arnold give it access to Arnold's collection (financial) receipts that pre-dated D1 Sports Medicine's dates of service. This has caused an initial dispute with D1 Sports Medicine, which ended with D1 Sport's Medicine's stipulation that it would not be

given access to Arnold's collections that pre-dated October 1, 2015.

      *      However, D1 Sports Medicine's representatives, Greg Perry and David
McIntosh, stated that, due to Arnold's refusal to provide D1 with access to Arnold's
pre-date-of-service collections, D1 Sports Medicine was going to amend (reduce) the
financial performance projection that D1 Sports Medicine had previously provided
Arnold, as an inducement to enter into the Agreement.

      *      D1 Sports Medicine amended (reduced) its pro forma information.

      *      Arnold was not made aware by D1 Sports Medicine or its representatives
that the monthly expenses to be paid by Arnold in connection with D1 services would
include credentialing service fees.

      *      The termination of Arnold's billing agreement with its then-current
medical billing and collection service provided through on or about October 31, 2015,
and Arnold's transition of said services and the responsibilities thereof to "Medical
Billing Services, LLC," as of November 1, 2015, pursuant to the BCA that is attached as
Exhibit B hereto.

      *      In November, 2015, D1 Sports Medicine hired an additional physical
therapist to work at Arnold. The therapist presented for training in November and,
after only one (1) week of experience with D1 Sports Medicine, he resigned his
employment with D1, and returned to his previous employer, which reduced Arnold's
number of therapists and disrupted and affected the productivity at Arnold's medical
practice.

      *      Beginning as early as November, 2015, Arnold's clinical staff began

receiving reports of patient complaints, to the effect that the patients did not feel they were receiving appropriate attention or instruction during their therapy sessions.

\*      A common and recurring complaint was that Amy Jackson, whom D1 Sports Medicine had appointed as director of therapy services in Arnold's clinic, but who was also one of the physical therapists in the clinic, was spending a lot of time on her cell phone in the patient care area. It was reported that Ms. Jackson would frequently excuse herself from the patient care area so that she could place and receive telephone calls on her cell phone.

\*      Arnold was forced to spend administrative time to address the issue caused by Ms. Jackson, in an attempt to eliminate the foregoing complaints, and the disruption and reduced productivity and efficiency her conduct caused.

\*      Ms. Jackson's conduct set a poor example for non-management personnel, it had a substantial impact on patient care and satisfaction, and it disrupted and otherwise negatively affected the work environment and productivity at Arnold's medical clinic.

\*      Despite Arnold's efforts to resolve the problem, which included multiple discussions with D1 Sports Medicine's regional director, David McIntosh, Arnold continued to receive reports of the same conduct on the part of director and physical therapist, Amy Jackson.

\*      In late 2015, one of D1 Sports Medicine's therapists at Arnold submitted his resignation, effective December 17, 2015, and he reported concerns he had about the overall direction of the department, the lack of structure, and a poor work and patient

care environment that the lack of direction and structure had caused.

     *      On numerous occasions in the November/December, 2015 timeframe, Arnold brought these and other complaints and concerns to Mr. McIntosh's attention, as Arnold continued to receive feedback from patients as to suffering patient care, and the quality of care at Arnold, but to no avail.

     *      Among additional problems Arnold experienced during that same timeframe, D1 Sports Medicine's therapy team was inconsistent in following physician orders and protocols in Arnold's clinic, which affected the continuity of patient-care. Drs. Chris Arnold and Terry Sites brought those concerns to director Amy Jackson's attention, but the problems thereafter continued and, in fact, they continue to this very day.

     *      These additional issues were brought to Mr. McIntosh's attention, due to Ms. Jackson's failure to resolve them, but to no avail.

     *      D1 Sports Medicine's staff's inattentiveness during therapy sessions, and the patients' expressed lack of confidence in director Amy Jackson and complaints concerning D1 Sports Medicine's operational structure, at Arnold's medical clinic.

     *      D1 Sports Medicine excused Ms. Jackson's conduct and performance issues, and it refused to terminate Jackson's employment, though Arnold requested it.

     *      Additionally, D1 Sports Medicine failed to fill the full-time position from which its confiding therapist resigned as of December 17, 2015, as patient-care and satisfaction continued to worsen, and as Arnold's reputation as a medical provider and clinic continued to worsen as a result of the foregoing issues.

\*        As of February 1, 2016, which followed only 4 months of operations under the TSA, not only had Arnold not experienced any financial benefit from the parties' relationship or TSA, Arnold had suffered economic losses resulting from the relationship and, worse, the quality of patient care, the level of patient satisfaction, and Arnold's reputation had substantially suffered.

\*        Total expenses through January 31, 2016, exceeded Arnold's total collections for therapy services and, hence, Arnold had suffered a net, financial loss.

\*        Contributing to Arnold's net loss were expenses, including purported travel and meal expenses in connection with D1 Sports Medicine staff training, which were charged to Arnold and exceeded (more than doubled) the estimates that D1 provided as an inducement to enter into the TSA.

\*        Other expenses that were charged by D1 Sports Medicine exceeded the estimates it provided to Arnold prior to contract, while, at the same time, collections decreased, as part of a billing system over which D1 Sports Medicine had exercised design and management authority with the other entities named herein, and their owners and managers.

62.        In regard to the paramount issue of patient treatment, care, satisfaction, and confidence, and to the damage D1 Sports Medicine caused to Arnold's medical practice and reputation as a result of the low quality of D1 Sports Medicine's therapy and management services, the following patients, as mere representative examples, have provided the following information to Arnold in regard to D1 Sports Medicine and its services at Arnold's clinic (patient initials are used to protect the patient's

-16-

identity and health information from the public record):

Patient "PH" conveyed that some of her therapy sessions at the clinic were double-booked with the sessions of other patients, and that the treatment she subsequently received from another therapy provider was far better than the services she received from D1 Sports Medicine at the clinic.

Patient "CS" conveyed that, the quality of therapy services he received at the clinic went from great to really bad. CS further stated that D1 Sports Medicine did not keep up with his progress and had no idea as to how much weight he should use in his exercises, or how many reps he should do. Eventually, CS quit going to Arnold for therapy services, due to the lack of attentiveness of D1 Sports Medicine's therapists. CS further conveyed that his daughter, "BS," had a similarly bad experience with D1 Sports Medicine's services at Arnold's clinic.

Patient "LG" stated that her experience with D1 Sports Medicine's services at the clinic, in connection with the physical therapy she received following her hip replacement surgery, were so bad that she quit Arnold and sought the services of a different provider. The matter was so upsetting to LG that she cried as she conveyed the information. She described D1's therapist as uncaring.

Patient "KK's" mother provided a statement to the effect that, following surgery on KK's knee, D1 Sports Medicine's therapist put an electric stimulator on KK's knee, and it was turned up so high that, when it was turned on it hurt KK to the point of causing her to cry. D1 Sports Medicine's therapist acknowledged she had turned the stimulator up too high, but she also suggested that KK needed to 'suck it up' and be tougher. KK's mother also relayed that the therapist was not with her during most of KK's session time. KK told her mother she didn't want to continue to deal with D1's therapist and, consequently, they quit going to Arnold's clinic for therapy.

Patient "JJ" stated that she told D1 Sports Medicine's therapist that her hand was swollen and sore, following her shoulder surgery, and that she was unable to use it. The therapist grabbed her hand and jerked it back and forth, causing her pain. JJ complained to Arnold's nurse. Subsequently, the therapist did not have the same attitude toward JJ; she didn't treat her as well. Additionally, JJ was left alone for most of her session time, and her treatment did not progress as well or as quickly as even D1's therapist thought it should have. JJ indicated it was obvious that the therapist had not been checking JJ's progress notes. JJ did say that

one of the other therapists was caring, and that he knew what he was doing, but she now does water aerobics instead of receiving additional therapy from D1 Sports Medicine at Arnold's clinic.

Patient "CW" received physical therapy services from D1 Sports Medicine at Arnold, following surgery on her right shoulder; two D1 Sports Medicine therapists provided the services. When CW first started therapy, she told the therapists she could not extend her elbow. CW stated that the therapists ignored her and attempted to push her beyond her limit at the time. They told CW that she wasn't doing well because she was nervous, and they placed a towel over her head so that she wouldn't see what they were doing, which merely caused CW additional stress. After three weeks of bad treatment by the therapists at the clinic, CW quit seeking physical therapy at Arnold, and she began receiving it from the athletic trainer at her school. The therapy CW has received from her school's athletic trainer has substantially improved her condition, and CW has now reached the normal level of recovery. CW's father indicated he did not observe any of what CW relayed because D1 Sports Medicine's therapists would not allow him or his wife (CW's mother) to go into the therapy room and attend their daughter's therapy sessions.

Patient "ML" conveyed the following:

I have been Dr. Chris Arnold's patient since 2002. Dr. Arnold has been a major part of my orthopedic care – primarily my knees.

With each knee surgery, I have been a patient of his recommended physical therapy. Dr. Arnold has always overseen my therapy and recovery.

2015/2016 was a year of extensive surgeries and recovery. I spent 12 weeks in therapy at AOS with Michael Martin as my primary therapist. Coming out of the first surgery being non weight bearing and well beyond what I had previously experienced with other surgeries, it was the knowledge, skill, and personal support of Michael and the other therapists (Dalton, David, David, & Logan- and office staff worker Karen) that made the real difference.

I spent a lot of time over a 7-month period with these caring people who were as devoted to my recovery as I was. There were times when I was not sure I was going to be able to do therapy, or get to that next level of recovery; it was that group of dedicated people who were invested in supporting me to reach and achieve the best results that I personally could. I am thankful and indebted to each of them. Michael recommended that we speak with Dr.

Arnold and transition to the AFP personal trainer once I was stable and to focus on strengthening so that 1) I didn't exhaust all of my therapy sessions; and 2) Strengthen to the maximum potential before my second surgery.

Following my second surgery in September of 2015, I had only a couple of therapy visits left that would be covered by my insurance. Dr. Arnold and Karen petitioned my insurance to allow for more therapy visits. That request was denied and my husband and I decided to pay out of pocket for therapy and work with AFP trainer Kim Summer.

Following my second surgery, AOS physical therapy had begun the process of being taken over and managed by D1 Sports Medicine. I was slightly reluctant, but was assured that Michael would be there and still be my therapist.

I watched patient after patient leave Arnold during this merger.

When I was completely out of insurance coverage for therapy, we met with Michael every two weeks for him to assess my progress and then he met with Kim on the AFP side to help me carry out the exercises and strengthening.

I was then told at the beginning of December that Michael would be leaving D1 Sports Medicine in the middle of December. I was shocked and saddened. I could see the writing on the wall and one by one the therapists of the program that Dr. Arnold had built AOS physical therapy to be--- were leaving and it was apparent that things were changing.

I was stressed for the folks coming in as I watched the level of professionalism lowering (staff eating in the therapy area, staff on their cell phones, staff not engaging with patients the way I had become accustomed to the previous 7 months), and the morale of the therapy area declining. I knew that I still needed help, but wasn't comfortable with what I was seeing unfold before me.

In January of 2016 I was still having complications and Dr. Arnold decided to do another knee scope and see what was going on. He indicated that I might have produced too many cells or cells may not have grown, that scar tissue may be causing problems, etc. and that he would not know without looking inside the knee.

He scoped my knee on January 15, 2016. I was scheduled for therapy at D1 Sports Medicine a couple of days later. I went in and Amy Jackson was scheduled to do my evaluation. She did my evaluation out in the main

therapy area (which Michael had always completed my initial evaluations in a private room). I was concerned and shocked, because had that been one of my previous surgeries - I was not in a physical or mental state to have done that out in the main therapy area with other patients.

Amy Jackson had been there for several months while I was back and forth between Michael during the D1 Sports Medicine merger and Kim on the AFP side, and I know that she saw me regularly. Amy was very impersonal in our initial contact and saw me as a patient who had just had a knee scope. She did not appear to have read my history or to know what I was there for – because in interactions, I was a just a scope patient. She asked me what I previously had done because she thought she had seen me there. I told her the extensive work that had been done the months prior, a high tibial osteotomy, ACI harvest and re-implantation, and a meniscus transplant-- and she did not react. She had me do quad sets, and knee bends, calf stretches, and hooked me up to the NEMS machine and put on the game ready. She did not engage in much conversation, she worked a bit on her computer, asked David McIntosh to get her a paper hanging on the wall and he replied "that's a paper for Dr. Sites patients and she is Dr. Arnold's." Amy replied that she knew. Amy sat there and worked on other patients' paperwork rather than being present and working with me. We did a few exercises, the NEMS machine and game ready in my 45-minute/1 hour appointment time and she was completely disinterested and engaged.

Amy Jackson and I did as much in that visit as Michael and I had done in 15 minutes. Michael pushed me to do more, to try harder, to achieve the best that I could, and Amy hardly acknowledged that she was there to help me do anything more than I was already doing at home. I told my husband that I was not going back. If that was all I needed to do - I could do that at home and not waste what I considered to be valuable—therapy visits as I am limited to 30 a year. I have a NEMS machine and can do that - I have ice packs - and I already was doing those exercises prior to coming to my evaluation.

For me, with all that I had been through, to be dismissed like that—and that I WASTED a valuable therapy visit, on that— I was livid. I was so upset that I contacted Dr. Arnold's scheduling manager, Pam Moore, and told her what had happened. The information was passed along to Dr. Arnold. When I went in for a follow up visit I was asked to share the information with Judd Semingson, who is Dr. Arnold's Administrator. Judd was out of the office so I met with Kayla and gave her the information. Judd called me a few days later and he asked if it would be ok if he passed my contact information along to D1 Sports Medicine's regional manager.

The regional manager, David McIntosh, contacted me later and asked what he could do to correct the situation. I explained to him that I had been through too much to go backwards because a therapist didn't have a vested interest in helping me achieve the best results that I can, given my current physical circumstances. I explained all that I have had done and all that I was doing to recover and get back to "normal" — whatever my new normal is going to be — I wanted to be the best I could be. He said he would call Amy Jackson and that they would give me the "star treatment." I'm sorry - but every patient who has had surgery and is sent there should be treated like a star. He asked if my deductible with my insurance had been met, and I told him of course it had been met - I had just had surgery. He asked if I had a copay for my visits and I told him yes. He said they would cover all my co-pays if I wanted to come back. I asked him if it were him or his wife and they had been through all that I had been through and then to go there for that kind of treatment that I had received from Amy — would he go back- or would he tell his wife to go back? He answered- "NO!" I told him that I was not willing to risk reaching the best results that I can achieve on a therapist who was not invested in me and helping me to achieve those results. I told him that I would talk to my husband and that we would let Karen know our decision.

My husband and I talked about it and decided to take my therapy to one of the old therapists who was still in the area, working for another therapy company.

I called Dr. Arnold's office and asked Karen to transfer my therapy prescription to Ozark Orthopaedics Physical Therapy. I made that request twice but to no avail. I received an appointment reminder call from Savannah downstairs at the front desk at Arnold and asked her to get a copy of my orders, and I told her I would pick them up and take them and deliver them to Ozark Orthopaedics Physical Therapy myself.

I have since completed therapy and returned to working with Kim at AFP for continued strengthening and progress toward optimum recovery.

63.     On February 5, 2016, Arnold and D1 Sports Medicine, acting through its

representatives, discussed the issues, in which a 90 day plan was outlined to resolve

them, in attempt to salvage the parties' contractual relationship, and to provide D1

Sports Medicine with more time than what is actually afforded in the Agreement for it

to help Arnold do so. Those issues included adequate staffing, lack of professionalism in the office, physician-patient relationships, and improving patient care and satisfaction.

64.     As a result of those discussions, Greg Perry of D1 Sports Medicine promised to travel to Arnold's clinic in Fayetteville, for further discussion, in-person. But he never did so.

65.     Instead, on February 25, 2016, Mr. Perry promised Arnold that, if either party did not see satisfactory progress and resolution following the 90 day period, Arnold and D1 Sports Medicine would "unwind the deal and go our separate ways without any hard feelings."

66.     Arnold reasonably relied upon D1 Sports Medicine's (Mr. Perry's) promise and, to its detriment, it forewent and delayed in taking any other action in the matter, while it continued to utilize D1 Sports Medicine's services to its financial detriment, so as to afford D1 Sports Medicine an opportunity to improve its services, and while it continued to subject itself to reputational injury and economic loss in connection with D1's therapy services.

67.     Later in February, 2016, billing issues with D1 Sports Medicine's medical billing services were discovered and reported to Arnold by D1 Sports Medicine employee Karen Cook. Ms. Cook reported the double-billing of patients, in connection with D1 Sports Medicine's and "Medical Billing Service's" use of separate codes, which those two businesses used concurrently in billing for the same services. This dual-coding procedure was discovered five (5) months subsequent to the start of D1 Sports

Medicine's operations at Arnold's clinic.

68.     In April of 2016, Mr. McIntosh was provided with information outlining Arnold's billing concerns. Units billed per patient visit had increased dramatically following D1 Sports Medicine's assumption of the billing system and management, though collections for those same units had increased only marginally by comparison.

69.     Additionally, D1 Sports Medicine failed to provide any oversight of the collections in connection with its therapy services.

70.     On April 12, 2016, Arnold learned that Karen Cook had resigned from her position with D1 Sports Medicine's therapy services.

71.     It wasn't until April 19, 2016, which was approximately 75 days into the agreed 90·day plan of resolution, that Kim Provento (D1 Sports Medicine) requested, via email, access to Arnold's billing system (NextGen), for the purpose of performing an audit in an attempt to resolve these billing and collection issues.

72.     Mr. McIntosh also confirmed that D1 Sports Medicine was removing Amy Jackson from her position of director of Arnold's therapy services department, which was approximately four (4) months following Arnold's request that D1 do so.

73.     On April 21, 2016, D1 Sports Medicine was presented with a written acknowledgement of the lack of institutional control or improvement following Arnold's February 5, 2016 notice and 90 day resolution plan. A true and correct copy of the written *Notice and Acknowledgement* is attached, incorporated herein by reference, and made a part hereof, as if set forth word for word hereinafter immediately below, as **Exhibit D** hereto.

74.     D1 Sports Medicine, however, refused to sign the acknowledgment of the

issues with which Arnold had been forced to deal following the parties' execution of the TSA in August, 2015.

75.    On April 25, 2016, Brett Rivers, acting on behalf of D1 Sports Medicine, confirmed D1 Sports Medicine's refusal to sign the written acknowledgment, and he proposed a new plan for resolving Arnold's issues, effectively repudiating the promise that Mr. Perry (D1 Sports Medicine) had made to Arnold on February 25th, that is, the promise to follow a 90 day resolution plan. The dishonoring of D1's earlier promise was merely an attempt to buy D1 additional time, and to further drag out and delay the dispute so that D1 could profit even more than it already had from the parties' TSA.

76.    At that point, however, Arnold was intent on relying upon Mr. Perry's promise on February 25th, and on the 90 day plan on which the parties agreed, as Arnold could not afford to not terminate the parties' relationship due to the ongoing patient-care, work environment, and billing issues, and the resulting reputational and economic injuries from which Arnold had already suffered. Both Arnold's and its patients' trust and confidence in D1 Sports Medicine had so severely diminished that Arnold could not afford to provide any additional time to D1 to rectify matters.

77.    On May 4, 2016, following Mr. Perry's February 25th promise, and as well as Mr. Rivers' April 25th refusal to acknowledge D1's failures, and his repudiation of the 90 day plan on February 5th, Arnold's legal counsel provided written notice, in letter form, of Arnold's intention to terminate the parties' TSA, effective June 10, 2016, in the interest of patient care, for cause.  A true and correct copy of the written letter is attached, incorporated herein by reference, and made a part hereof, as if set forth word for word

hereinafter immediately below, as **Exhibit E** hereto. And a receipt of said notice was acknowledged by D1 in a letter dated May 12, 2016.

78.     At that point, D1 Sports Medicine had reneged on its promise to "walk away," and it had refused to acknowledge or, in any event, cure any of its failures, after having received Arnold's notice and request almost 90 days earlier that it do so.

79.     Moreover, in an attempt to coerce or blackmail Arnold, D1 Sports Medicine's representative had irreparably damaged the parties' relationship even further, by threatening Arnold with a report of gender discrimination in connection with the termination of a female employee.

### Facts Relative to All Defendants

80.     In the fall of 2015, prior to Arnold's execution of its *Billing and Collection Agreement* ("BCA") with "Medical Billing Services, LLC," Arnold was introduced and referred to Medical Billing Services, by D1 Sports Medicine's representatives.

81.     The representatives of D1 Sports Medicine and Medical Billing Services, namely Greg Perry, David McIntosh, and Terri Connell, misrepresented that Medical Billing Services was a legitimate (existing), separate, and unrelated company that was in the business of providing medical billing services to medical clinics like Arnold; and Arnold relied upon those representations, to Arnold's detriment.

82.     Arnold was encouraged by said misrepresentatives of D1 Sports Medicine and Medical Billing Services to switch from its then-current medical billing and collection service provider to Medical Billing Services.

83.     Said representatives of D1 Sports Medicine and Medical Billing Services

misrepresented to Arnold that Medical Billing Services could outperform and generally provide a much better quality service, and make Arnold more profitable in terms of its per unit collection rate (as a percentage of its amounts charged), than Arnold's then-current provider.

84.    Arnold detrimentally relied upon D1 Sports Medicine's recommendation, referral, and misrepresentations, and upon the fictitious business and *pro forma* information that was provided by "Medical Billing Services" prior to the parties' execution of the BCA on October 29, 2015, which Medical Billing Services altered subsequent thereto.

85.    On or about October 29, 2015, Arnold was presented with, and Arnold executed, the BCA (Exhibit D) with "Medical Billing Services, LLC", which an attorney or other representative of Medical Billing Services, LLC, and/or one of the other entities identified hereinabove had prepared for Arnold's signature.

86.    On page 6 of 10 of the Billing and Collection Agreement, Terri Connell was held out as, and was represented to be, the "President" of Medical Billing Services.

87.    At all relevant times, the individual defendants named herein knew Medical Billing Services, LLC, was not an existing company, and that the defendant-companies and individual defendants herein had common ownership, management, and/or other financial interests.

88.    Subsequent to the filing of this action in June of 2016, Arnold has learned that Medical Billing Solutions purports to have, on some unknown date, acquired all of Medical Billing Services' assets, including its accounts-receivable rights under its BCA with Arnold.

89.    However, at no time prior to September 19, 2016, did Arnold ever receive any

notice of the purported contract-assignment, from either Medical Billing Services or Medical Billing Solutions and, to-date, no proof of the purported acquisition and transfer has ever been provided to Arnold.

90.   Subsequent to the filing of this action in June of 2016, Arnold has also learned that Medical Billing Services, LLC, has never been registered to do business in any State in the United States. That is to say, no company named "Medical Billing Services, LLC," has ever existed. It was not a legal entity at the time of execution of the Billing and Collection Agreement, the purported assignment of the account to Medical Billing Solutions, or at any other time; upon current information and belief, Medical Billing Services, LLC, is and always has been a legal fiction.

91.   Arnold was not apprised of those common interests at any time prior to its execution of the TSA with D1 Sports Medicine, or the BCA with "Medical Billing Services, LLC," or at any time prior to the filing of this lawsuit.

92.   Instead, those interests, the non-existence of Medical Billing Services, LLC, and Medical Billing Solutions, LLC's purported acquisition of Medical Billing Services, LLC's assets, including Arnold's service account with Medical Billing Services, LLC, were concealed by all current prospective defendants that are named in this motion.

93.   Furthermore, neither "Medical Billing Services" nor Medical Billing Solutions has performed as was promised by Medical Billing Services and its representatives as an inducement to enter into the BCA that was signed in October of 2015; in fact, they substantially underperformed in their services to Arnold under the BCA, while also incurring fees and expenses billed to Arnold by D1 Sports Medicine that were higher than

represented as an inducement to contract with D1 Sports Medicine.

94.    Upon current information or belief, Medical Billing Services' representatives were actually representing and acting on behalf of the interests of Medical Billing Solutions, LLC, and/or D1 Sports Parent, LLC, MRM, and/or one or more of the other entities that have been identified as John Doe defendants herein.

95.    "Medical Billing Services" and Medical Billing Solutions grossly underperformed under the BCA with Arnold; the services they provided did not result in the profits Arnold reasonably expected and was promised, or as promised by "Medical Billing Services" as an inducement to contract.

96.    Following the parties' execution of the BCA, Medical Billing Services and Medical Billing Solutions and their related entities named herein negligently failed to perform work that was available, reasonable and necessary to collect clinic fees billed in Arnold's name.

97.    Therefore, Arnold has recently terminated the BCA with "Medical Billing Services, LLC."

98.    As a proximate result of D1 Sports Medicine representatives' recommendation of "Medical Billing Services, LLC," and of "Medical Billing Services, LLC's" resulting promises, failures to perform, and negligence under the contract into which Arnold was induced to enter in a case of fraudulent concealment of common ownership, management, and business interests between the defendants, and of the fraudulent misrepresentation of the existence of "Medical Billing Services, LLC," and the true identities of the entities with which Arnold was actually contracting when it signed the

Billing and Collection Agreement on October 29, 2015, Arnold has suffered more $500,000.00 in lost profits.

**Petition for Declaratory Judgment – Re: Therapy Services Agreement**

99.     All statements made hereinabove are incorporated by reference, as if set forth word for word hereinafter immediately below.

100.     The Arkansas Supreme Court has long ruled that a contract should not be enforced if it is contrary to public policy. *Carter v. Bradley County Road Imp. Dists. Nos. 1 and 2*, 246 S.W. 9, 155 Ark. 288 (Ark., 1922).

101.     In 1995, the Arkansas Court of Appeals, citing a United States Supreme Court Case, stated that, "as with any contract, however, a court may not enforce, a collective-bargaining agreement that is contrary to public policy… such a public policy, however, must be well defined and dominant, and is to be ascertained "by reference to the laws and legal precedents and not from general considerations of supposed public interests." (Citations omitted.) *Doe v. Central Arkansas Transit*, 900 S.W.2d 582, 50 Ark. App. 132 (Ark. App., 1995).

102.     And, in a 1989 decision, the Arkansas Court of Appeals acknowledged the appropriateness of a Court's refusal to enforce any legal obligation (promise) that would be violative of law, or contrary to public policy or precepts of morality. *Dean Leasing, Inc. v. Van Buren County*, 767 S.W.2d 316 (Ark. App., 1989).

103.     Further, in 1942, the Arkansas Supreme Court also found that the attempted restraint of a healthcare provider's trade, in a case in which the plaintiff sought an injunction that would have restricted the dentist's dental practice, to be unreasonable, as it

placed an undue and inequitable hardship on the dentist and his dental practice. *Marshall v. Irby*, 158 S.W.2d 693 (Ark., 1942). The Court also noted that in cases in which a restraint of trade unreasonably restricts the alienation or use of anything that is a subject of property, the restraint is unreasonable. *Id.*

104.    And, in 2005, the Arkansas Supreme Court expressly acknowledged, as matter of public policy, that the fracture of the doctor-patient relationship is paramount to a business interest with which the doctor-patient relationship is in conflict, and that, in such cases, "the equities and public policy weigh in favor of the doctors." *Baptist Health v. Murphy,* 209 S.W.3d 360, 362 Ark. 506 (Ark., 2005).

105.    The Court further recognized the valid interest that physicians have in protecting themselves and their medical practices from reputational injury because an injured reputation is reflective of a physician's level of professional competency and, in turn, disruptive of the doctor-patient relationship. *Id.*

106.    In 2010, in addressing a hospital policy that, had it been enforced, would have restricted the physician's medical practice, the Arkansas Supreme Court underscored its earlier affirmation of public policy, by recognizing that physicians and their patients have specific contractual relationships of their own, whereby physicians agree to provide care to their patients, and their patients agree to accept their care and compensate them for it; that the doctor-patient relationship carries a reasonable business expectancy; and that the physicians' relationship with referring physicians also carries a reasonable business expectancy. *Baptist Health v. Murphy*, 373 S.W.3d 269, 2010 Ark. 358 (Ark., 2010).

107.    Suffice to say, the strength and quality of a doctor's relationships with his

patients are primarily dependent upon the quality of care his patients receive, and patient satisfaction.

108.    All patients have a paramount interest in receiving the highest quality of healthcare available, and the quality of private healthcare is a matter of paramount public interest, hence the State's regulatory authority over those who provide it; it's a matter of public health, safety, and welfare.

109.    Furthermore, a doctor's reputation, and that of his medical practice, are paramount to a pure business (financial) interest that arises out of a contract that purports to prohibit any termination thereof, except on limited financial and other grounds which do not include such factors, and which do not otherwise permit immediate termination for cause.

110.    Pursuant to Ark. Code Ann. § 16-111-101 et seq., this Court should declare the parties' TSA unenforceable and void, as it is contrary to the public policy of the State of Arkansas. The TSA places a specific restraint of trade on Arnold's medical practice, clinic, and services, by prohibiting Arnold from contracting with or utilizing any therapy services other than those offered by D1 Sports Medicine's leased employees, while also prohibiting *any* termination of the Agreement, much less *immediate* termination, based on patient complaints, business loss, reputational damage, or the doctor's medical assessment and opinion of the quality of patient-care in his own clinic.

111.    The TSA, which was provided by D1 Sports Medicine for Arnold to execute, fails to even address what is paramount in the healthcare trade, which is patient-care and the quality thereof; it fails to address what, if anything, Arnold can do in the situation in

which the quality of patient care suffers and, consequently, Arnold suffers reputational injury and business loss.

112.   In that regard, the TSA contains no promise or requirement of D1 Sports Medicine, in regard to the quality of D1 Sports Medicine's therapy or therapy management services, or its compliance with physician policies and protocols, or the applicable standard of care.

113.   Furthermore, it specifically purports to, quite literally, lock Arnold down to no fewer than 12 months, and as many as 5 years, of services by D1 Sports Medicine – unless Arnold can show a material breach of one or more of the general performance requirements, none of which addresses the quality or level of D1 Sports Medicine's therapy or therapy management services from a patient care or standard of care perspective.

114.   That is, absent a breach of one or more of the general performance requirements of D1 Sports Medicine, the TSA restrains Arnold's medical practice (trade) by prohibiting it from terminating the agreement <u>or</u> offering its patients (in its own medical clinic) the therapy services of another therapy service provider, for no fewer than 12 months and, short of narrowly defined and limited "economic reasons," for as many as sixty.

115.   What is more, the TSA further restrains trade and prohibits best healthcare choices, as determined by Arnold's licensed physicians, by further imposing 90 and 30 day, pre-termination notices to D1 Sports Medicine, which are further contrary to the physician-patient relationship in a situation in which the physician has determined, in its medical opinion, that any continuation of the contractual relationship would be detrimental to

patient care and health.

116.    Furthermore, the numerous issues with which Arnold has had to deal from the outset of its relationship with D1 Sports Medicine have affected the overall efficiency, efficacy, productivity, quality, and profitability of Arnold's medical practice.

117.    But more significantly, they have affected patient healthcare and satisfaction, and the reputation of Arnold's medical practice and clinic.

118.    Notwithstanding "economic reasons," if Arnold's physicians believe that continuing to utilize D1 Sports Medicine's services is contrary to Arnold's patients' best health interests from a quality of patient-care perspective, Arnold should not, as a matter of public policy, be restrained (prohibited) by the purported terms of a business contract to discontinue its use of such services, or change service-providers within its own clinic, for any period of time, much less such an extended period of 1-5 years – particularly if D1 Sports Medicine's services have negatively impacted Arnold's physician-patient relationships, and damaged the reputation of Arnold's medical practice and physicians.

119.    In such a case as this one, the contract (TSA) should be declared void for public policy reasons, and unenforceable, as it is contrary to Arkansas's public policy against unreasonable restraints of trade and, more significantly, the doctor-patient and referring patient relationships, which are likewise contractual in nature, and which expose Arnold and other physicians like Arnold to malpractice claims in connection with any medical services that are below the standard of care.

120.    Arnold, therefore, respectfully petitions the Court to enter a declaratory judgment, declaring that the parties' contract (TSA) is voidable and unenforceable against

Arnold, as both an unreasonable restraint of trade based on the undue and inequitable hardship on Arnold's physician-patient relationship (and contractual relationship), reputation, financial condition, and exposure to liability based on a breach of the standard of care by D1 Sports Medicine's leased employees, and as against public policy with respect to an agreement that is contrary to patient-care and satisfaction, the standard of care to which Arnold is held with respect to all services that are provided in Arnold's clinic, and the contractual relationships Arnold has with its patients and referring physicians.

121.     However, the TSA should otherwise be declared terminated in accordance with the terms thereof, effective June 10, 2016.

### Civil Count I – Breach of Contract against D1 Sports Medicine, LLC

122.     All statements made hereinabove are incorporated by reference, as if set forth word for word hereinafter immediately below.

123.     This claim is brought in addition and otherwise as an alternative to Arnold's petition for declaratory judgment. The TSA is voidable and unenforceable against Arnold, as against public policy and for the reasons stated hereinabove. But in the event the Court disagrees, Arnold asserts this breach of contract claim against D1 Sports Medicine.

124.     D1 Sports Medicine materially breached the TSA by: failing to comply with physician protocols; failing to properly monitor and care for patients during therapy; failing to timely respond to Arnold's principal physicians' reasonable requests for modification and improvement of D1 Sports Medicine's therapeutic practices; failing to comply with those physician-requests and modify D1's therapeutic practices; failing to meet reasonable scheduling requests by Arnold's principal physicians; and failing to

provide an efficient, productive, well organized, and good or healthy work environment in which patients, Arnold's principal physicians, and Arnold's staff had confidence in the therapy and management services provided by D1 Sports Medicine.

124.    Said failures by D1 Sports Medicine resulted in interruptions of, and delays in, patient care and the medical healing process, and in the interference with the continuity and inefficiency of Arnold's medical practice, to the direct or indirect detriment of all patients.

125.    Said failures also potentially exposed Arnold and Arnold's principal physicians with legal liability, and they resulted in patient dissatisfaction, potential patient injury, and reputational injury and business loss to Arnold.

126.    Further, D1 Sports Medicine failed to properly implement and administer an appropriate billing system for patient services, which resulted in coding errors and improper billing to third-parties, which exposed Arnold to legal liability, reputational injury, and additional business loss.

127.    Still further, D1 Sports Medicine implicitly agreed to provide therapy services that were of a high quality, and that otherwise met the standard of care applicable to licensed therapists who practice in Fayetteville, Arkansas, and similar localities. And by failing to provide care that met the standard of care, D1 Sports Medicine exposed Arnold to legal liability.

128.    Additionally, D1 Sports Medicine implicitly agreed not to interfere with Arnold's business or the general functionality, efficiency, or productivity of the same; and it breached the TSA in those additional respects.

129.    D1 Sports Medicine also implicitly agreed not to damage Arnold's reputation in the medical community in Northwest Arkansas, or interfere with Arnold's ability to maintain and continue to develop strong relationships with patients; and it breached the TSA in that additional respect.

130.    Further, D1 Sports Medicine refused and otherwise failed to terminate Amy Jackson as director of the therapy services provided by D1 Sports Medicine, and it continued to employ her in that capacity for months following Arnold's request that she be terminated based on her refusal or failure to modify her behavior and inattention to patient care in Arnold's clinic, which was a breach of a material term of the TSA.

131.    Every contract contains the requirement of good faith and fair dealing by all parties and, yet, subsequent to the parties' execution of the TSA, D1 demanded financial receipts to which it was not entitled to have from Arnold under the TSA (re: collections information that pre-dated D1's dates of service) and, when Arnold refused to provide it, D1 amended the projected income (pro forma) information that D1 provided to Arnold as an inducement to contract. D1's demands and pro forma amendment constitute bad faith and unfair dealing with Arnold.

132.    And when the parties' contractual relationship deteriorated further, D1 Sports Medicine threatened Arnold with a gender discrimination claim, in an attempt to coerce or blackmail Arnold into acquiescing to a non-termination of the TSA, and the continuation of the parties' business relationship notwithstanding all of the irreparable damage already done to Arnold.  D1 Sports Medicine's threat constitutes bad faith and unfair dealing with Arnold.

133.    D1 Sports Medicine materially breached the TSA in all of the foregoing respects.

134.    As a result of D1 Sports Medicine's material breaches of the TSA, Arnold has suffered reputational injury and lost business profits and incidental and consequential damages, for which it should have a judgment over and against D1 Sports Medicine, in amounts that will be proven at trial, together with its attorney's fees, costs, and pre and post-judgment interest on all sums certain.

### Civil Count II – Fraud against D1 Sports Medicine, LLC, Greg Perry, and David McIntosh

135.    All statements made hereinabove are incorporated by reference, as if set forth word for word hereinafter immediately below.

136.    This count is brought in addition, or otherwise in the alternative, to Arnold's other claims and petition set forth herein.

137.    D1 Sports Medicine, Greg Perry, and David McIntosh provided false and otherwise misleading information to Arnold, including false and misleading *pro forma* information, which the defendants amended (corrected) only subsequent to Arnold's execution of the TSA, as an inducement to contract.

138.    Additionally, the defendants misrepresented and otherwise knowingly and intentionally withheld material, factual information concerning their relationship and common interests with Terri Connell and the other entities named herein, including the fact that Medical Billing Services, LLC, was a fictitious company with which the defendants shared common ownership, management, and/or business interests.

139.   Arnold additionally relied upon the separate, false *pro forma* information which these defendants provided in regard to "Medical Billing Services, LLC."

140.   Arnold detrimentally relied upon the false and otherwise misleading information that was used by these defendants as an inducement to contract with both D1 Sports Medicine, LLC, and Medical Billing Services, LLC.

141.   Arnold is entitled to judgment over and against D1 Sports Medicine, Greg Perry, and David McIntosh, jointly and severally, in the amount of all of the aforesaid compensatory damages that will be proven in amount at trial.

142.   Further, Arnold is additionally entitled to a punitive damage award in an amount necessary to punish and deter the same or any similar conduct by these defendants or any of its principals and affiliated companies in the future, which, in this case, should be no less than $3,000,000.00.

### Civil Count III – Promissory Estoppel against D1 Sports Medicine, Greg Perry, and David McIntosh

143.   All statements made hereinabove are incorporated by reference, as if set forth word for word hereinafter immediately below.

144.   This count is brought in addition, or in the alternative, to Arnold's other claims and petition set forth herein.

145.   On February 25, 2016, Mr. Perry, acting on D1 Sports Medicine's behalf, and with D1's authority, promised Arnold that, if either party did not see satisfactory progress and resolution following the 90 day period that Arnold and D1 Sports Medicine would "unwind the deal and go our separate ways without any hard

feelings."

146.    D1 Sports Medicine, however, subsequently repudiated its promise, though Arnold had reasonably relied upon it over a lengthy period of time in excess of any pre-termination notice provision in the TSA.

147.    Consequently, Arnold forewent and delayed in taking any other action in the matter, while it continued to utilize D1 Sports Medicine's services so as to afford D1 an opportunity to improve its services. During such period of time, and at all times since Mr. Perry's promise in February of 2016, Arnold has continued to suffer reputational injury and economic loss as a result of D1's presence and services in, and affiliation with, Arnold's medical clinic.

148.    Further, these defendants promised that contracting with "Medical Billing Services, LLC," would result in greater profits for Arnold, which they did not.

149.    Arnold should have judgment over and against D1 Sports Medicine, Greg Perry, and David McIntosh, jointly and severally, in the amount of all restitution damages proven in amount at trial, including all lost profits suffered by Arnold as result of D1 Sports Medicine's rendering of therapy and therapy management services prior to contract termination, as well as the separate and additional lost profits resulting from the rendering of services by Medical Billing Services, LLC, in connection with the TSA and BCA, respectively.

### Count IV – Violation of Deceptive Trade Practices Act against
### D1 Sports Medicine, LLC, Greg Perry, and David McIntosh

150.    All statements made hereinabove are incorporated by reference, as if set forth

word for word hereinafter immediately below.

151.    This count is brought in addition, or in the alternative, to Arnold's other claims and petition set forth herein.

152.    A.C.A. 4-88-101, et seq., commonly referred to as Arkansas' Deceptive Trade Practices Act (hereinafter "the Act"), prohibits the herein-above described conduct on the part of D1 Sports Medicine, Greg Perry, and David McIntosh, namely the providing of false, misleading, or deceptive pro forma information and projections of the money Arnold could expect to make from its separate business partnerships with both D1 Sports Medicine and the fictitious company named Medical Billing Services, LLC, and by withholding (concealing) material information about Medical Billing Services, LLC, and the direct or indirect ownership, management, and/or other business interests it shared with D1 Sports Medicine and its owners and managers.

153.    Under A.C.A. 4-88-107, deceptive and unconscionable trade practices that are unlawful in Arkansas include but are not limited to knowingly making a false representation as to the use or benefit of a service, or engaging in any other unconscionable, false, or deceptive act or practice in business, commerce, or trade.

154.    The information D1 Sports Medicine, Greg Perry, and David McIntosh provided as an inducement to contract with both D1 Sports Medicine and Medical Billing Services, LLC, was false, exaggerated, misleading, and deceptive, and D1 Sports Medicine amended the information in regard to its own services only subsequent to Arnold's execution of the TSA.

155.    Not only did Arnold's net profits from therapy services provided in its

clinic not increase subsequent to the parties' TSA, they were dramatically decreased to the extent that Arnold suffered net monthly losses.

156.   At the same time, the services provided by Medical Billing Services, LLC, pursuant to the BCA, compounded Arnold's financial losses further, as Medical Billing Services, LLC, substantially underperformed, and failed to perform, as reasonably anticipated and required under the BCA; Medical Billing Services, LLC, failed to adequately bill and collect fees for Arnold, which resulted in an additional financial loss for Arnold.

157.   D1 Sports Medicine, Greg Perry, and David McIntosh are guilty of violating the Act, and Arnold is entitled to judgment over and against said defendants, jointly and severally, in the total amount of all lost profits and other damages sought under the other counts set forth hereinabove, in amounts that will be proven at trial.

158.   Said judgment should include a reasonable attorney's fee, pre and post-judgment interest on these sums certain, and punitive damages of no less than $3,000,000.00.

### Count V – Fraud against Teri Connell, Medical Billing Services, LLC (John Doe No. 1), and Medical Billing Solutions, LLC

159.   All statements made hereinabove are incorporated by reference, as if set forth word for word hereinafter immediately below.

160.   This count is brought in addition to Arnold's other claims and petition set forth herein.

161.   Defendants Teri Connell, Medical Billing Services, LLC (John Doe No. 1), and

Medical Billing Solutions, LLC, misrepresented that Medical Billing Services, LLC, was an existing, legal entity that had the legal capacity to enter into the BCA with Arnold.

162. Additionally, they misrepresented (fraudulently concealed) the two entities' and other defendants named in this action shared ownership, management, and business interests with Medical Billing Services, LLC, and Medical Billing Solutions, LLC.

163. Additionally, they mispresented the *pro forma* information and value of "Medical Billing Services, LLC's" services.

164. All representations were intended to induce Arnold to contract with "Medical Billing Services, LLC."

165. Arnold is entitled to judgment over and against Teri Connell, Medical Billing Services, LLC (John Doe No. 1), and Medical Billing Solutions, LLC, jointly and severally, in the amount of all of the aforesaid compensatory damages that will be proven in amount at trial.

166. Further, Arnold is additionally entitled to a punitive damage award in an amount necessary to punish and deter the same or any similar conduct by these defendants or any of its principals and affiliated companies in the future, which, in this case, should be no less than $3,000,000.00.

### Count VI – Breach of Contract or, Alternatively, Promissory Estoppel against Teri Connell, Medical Billing Services, LLC (John Doe No. 1), and Medical Billing Solutions, LLC

167. All statements made hereinabove are incorporated by reference, as if set forth word for word hereinafter immediately below.

168. This count is brought in addition to Arnold's other claims and petition set

-42-

forth herein.

169. Because Medical Billing Services, LLC, was not an existing entity that had legal capacity at the time of execution of the BCA, the BCA should be declared void and unenforceable, and Defendants Teri Connell, Medical Billing Services, LLC (John Doe No. 1), and Medical Billing Solutions, LLC, should be held liable, jointly and severally, to Arnold under the theory of promissory estoppel, for all lost profits resulting from Medical Billing Services, LLC's, and Medical Billing Solutions, LLC's failure to perform as promised in connection with the BCA with Arnold.

170. Alternatively, Medical Billing Solutions, LLC, and Terri Connell should be held liable for breach of contract (re: BCA), based on Terri Connell's false execution of the contract as "president" of Medical Billing Services, LLC, and based on Medical Billing Services, LLC's purported, subsequent acquisition of the rights and obligations of Medical Billing Services, LLC, that is, under the BCA, as "Medical Billing Services, LLC" (John Doe No. 1) breached the BCA, by failing to perform as reasonably expected, promised, and required thereunder.

## Count VII – Civil Conspiracy against All Defendants

171. All statements made hereinabove are incorporated by reference, as if set forth word for word hereinafter immediately below.

172. This count is brought in addition, or in the alternative, to Arnold's other claims and petition set forth herein.

173. Defendants, including John Doe Nos. 2-5, conspired with one another to induce Arnold to contract with each of them separately, for the purpose of profiting from

-43-

Arnold's business, while misrepresenting the existence of Medical Billing Services, LLC, concealing the relationships and common ownership, management, and shared business interests of the defendants, and misrepresenting the pro forma information provided to Arnold in connection with both the therapy management and billing and collection services, all as an inducement to enter into separate contracts.

174.    As a proximate result thereof, Arnold suffered substantial lost profits and reputational injury in connection with both agreements.

175.    Arnold should have judgment over and against all of the defendants, jointly and severally, in the amount of all additional economic damages proximately caused by D1's acts, omissions, and statements, in a total amount that will be proven at trial, together with punitive damages in an amount not less than $3,000,000.00, in order to punish and deter D1 from committing the same or any similar conduct in the future.

### Count VIII – Tortious Interference with Contract and Business Expectancy against All Defendants

176.    All statements made hereinabove are incorporated by reference, as if set forth word for word hereinafter immediately below.

177.    This count is brought in addition, or in the alternative, to Arnold's other claims and petitions set forth herein.

178.    The defendants intentionally interfered with the contracts and business relationships that Arnold had with its prior therapy and medical billing and collection providers, by encouraging Arnold to terminate those contracts and relationships, and by providing false and misleading information as described hereinabove, as an inducement to

-44-

contract with D1 Sports Medicine and Medical Billing Services.

179.    The defendants intended for Arnold to terminate its then-existing contracts, and forego its then-existing business expectancies, through false, misleading, and concealed information, for the purpose of securing contracts with Arnold and thereafter profiting therefrom.

180.    As a proximate result, Arnold's then-existing contracts and business relationships with Arnold were terminated, and Arnold subsequently suffered lost profits and suffered reputational injury in connection with the TSA and BCA.

181.    Arnold should have judgment over and against the defendants, jointly and severally, in the amount of all additional economic damages proximately caused by the defendants' tortious interference with Arnold's contracts and business expectancy, in a total amount that will be proven at trial, together with punitive damages in an amount not less than $3,000,000.00, in order to punish and deter D1 from committing the same or any similar conduct in the future.

**Count IX – Indemnification of Arnold – against Medical Billing Services, LLC (John Doe No. 1), Terri Connell, and Medical Billing Solutions, LLC**

182.    All statements made hereinabove are incorporated by reference, as if set forth word for word hereinafter immediately below.

183.    Defendants Medical Billing Services, LLC (John Doe No. 1), Terri Connell, and Medical Billing Solutions, LLC, as third-party defendants, should be held jointly and severally liable for contractual indemnification of Arnold, and for contribution in tort, on D1 Sports Medicine's counterclaim against Arnold, based not only upon their

failure to reasonably and adequately perform (bill and collect for Arnold) under the BCA, but also upon the false and misleading pro forma and other information they provided in regard to Medical Billing Services, LLC, and its services.

184.    Defendants Medical Billing Services, LLC (John Doe No. 1), Terri Connell, and Medical Billing Solutions, LLC, failed to bill and collect fees on Arnold's behalf, as was reasonably anticipated under Arnold's BCA with Medical Billing Services, LLC, from which any money owed to D1 Sports Medicine under the TSA would be paid by Arnold.

185.    Arnold should have judgment over and against these third-party defendants, jointly and severally, in the amount of any and all economic damages proven by and awarded to D1 Sports Medicine at trial.

**Petition for a Declaratory Judgment – Re: Billing and Collection Agreement**

186.    All statements made hereinabove are incorporated by reference, as if set forth word for word hereinafter immediately below.

187.    Pursuant to Ark. Code Ann. § 16-111-101 et seq., this Court should declare the BCA unenforceable and voidable as against Arnold because it was executed in the name and on behalf of an unregistered, fictitious entity that did not have any legal capacity to contract with Arnold.

188.    The damages sought under each count herein (Counts I-IX) exceed the minimum amount needed to establish diversity jurisdiction in our federal courts.

189.    **ARNOLD REQUESTS A TRIAL BY JURY ON ALL CLAIMS, PETITIONS, AND ISSUES SO TRIABLE.**

190.    Arnold reserves its right to amend its petition and complaint, and to assert additional counts and/or damage claims.

WHEREFORE, PREMISES CONSIDERED, the Plaintiff, Christopher A. Arnold, M.D., P.A., prays that this Court will enter a judgment wherein it declares the parties' agreements void or voidable as against Arnold, and in which the Court awards Arnold separate judgments against the separate and third-party defendants herein, inclusive of attorney's fees, costs, and interest; and for any and all other relief to which it might prove itself entitled, including but not limited to that which was requested in Arnold's original petition and complaint, whether specifically prayed for herein or not.

Respectfully submitted,

Plaintiff,

Christopher A. Arnold, M.D., P.A,

By: /s/ _____
S. Lance Cox BIN 98127
COX, COX & ESTES, PLLC
Attorneys at Law
P.O. Box 9630
Fayetteville, AR 72703-0028
(479) 251-7900
lcox@coxfirm.com


By: /s/ *G. Chadd Mason* _____
G. Chadd Mason BIN 93035
Cabana Law Group
3900 N. Front Street, Ste. 103
Fayetteville, AR 72703
(479) 442-6464
chadd@cabanafund.com

Plaintiff's Counsel

-47-

## CERTIFICATE OF SERVICE

I, Lance Cox, co-counsel for Christopher A. Arnold, M.D., P.A., d/b/a Advanced Orthopaedic Specialists, P.A., state that on the 4th day of November, 2016, I have filed the foregoing with the Clerk of the Court, and that a copy of the same will be sent to all counsel of record via email and ordinary mail.

Mr. Grant E. Fortson
Lax Vaughan Fortson Jones & Rowe P.A.
Cantrell West Building
11300 Cantrell Road, Suite 201
Little Rock, AR 72212

_____

S. Lance Cox